UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JACOB SHALIT,<br><br>Plaintiff, Counterclaim-Defendant,<br><br>v.<br><br>KENNY SCHACHTER,<br><br>Defendant, Counterclaim-Plaintiff. | **Case No. 1:19-cv-05971**<br><br>**ANSWER AND COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED** |

Defendant, Counterclaim-Plaintiff Kenny Schachter ("Schachter"), for his Answer, Affirmative Defenses, and Counterclaims against Plaintiff/Counterclaim-Defendant Jacob Shalit ("Shalit"), responds and alleges as follows:

## ANSWER

1. This case concerns a valuable and unique 1973 Porsche 911 RSR prototype race car, chassis no. 9113600686, known as "R7" that is owned by Plaintiff, and an effort by Defendant to pass off a replica car as the real R7.[1]

**Answer:** Defendant denies the allegations in paragraph 1 and footnote 1, except admits that this case concerns a 1973 Porsche 911 RSR prototype race car with

[1] In 1973 Porsche built eight 911 RSR prototype race cars (R1 through R8). Plaintiff's car, R7, is the seventh car in that series.

the chassis number 9113600686, commonly referred to as R7, and that R7 is unique and valuable.

2. Plaintiff has owned R7 since 2008, having acquired title to the car, along with the original chassis plate, and all of the mechanical parts that were removed from the R7 body shell after a wreck in Mexico in 1975. Because the chassis plate and all of the significant mechanical parts (e.g., the engine, transmission, brakes, suspension, oil cooler, pedal box, etc.) were saved after the wreck, it was possible to restore R7.[2]

**Answer:** Defendant denies the allegations in paragraph 2 and footnote 2, except admits that: (1) the 1973 Porsche 911 RSR prototype race cars use a construction in which the chassis and body are one piece and that the mechanical parts are attached to the chassis, (2) the chassis plate is a small metal plate used in non-race cars that is typically affixed to the chassis and is stamped with the chassis number, and (3) the chassis stamp is a stamping of the chassis number into the chassis.

3. Plaintiff commissioned Toluca Lake Historics in Toluca Lake, California, to restore R7 in "long tail" form in Viceroy racing livery, as it was raced by the Rebaque

---

[2] Vintage Porsche 911 models, including the 1973 RSR prototype race cars, use a unibody construction in which the chassis and body are one piece, and the mechanical parts are simply attached to the unibody. When discussing vintage Porsches, the unibody structure is commonly referred to as the "chassis," even though there really isn't a separate body and chassis. We use the terms body shell, chassis, and unibody interchangeably. The "chassis plate" is a small metal plate affixed to the unibody under the hood near the front bumper that is stamped with the chassis number. The term "chassis stamp" is a stamping of the chassis number into a panel of the unibody under the hood near the fuel tank.

Rojas racing team in 1973-74. The restoration was completed in 2009, and the car made its debut with Plaintiff at the wheel at the Monterey Historics Race in 2009. Plaintiff holds a California title to chassis no. 9113600686, a Certificate of Authenticity from Porsche, and FIA papers that permit Plaintiff to race his car as R7 at vintage car races throughout the world.

**Answer:** As to the first two sentences, Defendant denies the allegations in paragraph 3. As to the last sentence, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, except denies that Mr. Shalit or anyone else possesses a "Certificate of Authenticity" issued by Porsche that confirms Mr. Shalit's car is R7.

4. Starting in 2011 – two years after Plaintiff restored the real R7 and started racing it in the United States – someone who identified himself as Massimo Baliva, based in Rome and using an Italian Hotmail address, started "testing the waters" with a fake R7 by sending an email to a Porsche historian insisting that (i) he has owned R7 since 1977, and (ii) the car was in "original conditions [sic]" in Martini livery with the chassis plate still on the car.

**Answer:** Defendant denies the allegations in paragraph 4 of the complaint, except to assert that he lacks knowledge or information sufficient to admit or deny the allegations pertaining to the actions of Massimo Baliva and refers to the written statements of Mr. Baliva for their contents.

5. This was obviously complete nonsense as the car could not possibly be in original condition given the well documented history of R7, which shows that the rear

end was replaced twice, the car was repainted at least three times, there were numerous modifications since it raced in 1973, and the body shell was damaged in an accident in Mexico in 1975. Put simply, the claims by Mr. Baliva were ridiculous.

**Answer:** Defendant denies the allegations in paragraph 5.

6. Unfortunately, this fake R7 then found its way to a dealer in Monaco named Claudio Roddaro, and was eventually sold to Kenny Schachter, the Defendant in this action, for a price rumored to be several million dollars.

**Answer:** Defendant denies the allegations in paragraph 6.

7. Mr. Schachter appears to have at one point been a lawyer and art dealer in New York, but then he married Ilona Rich, the eldest daughter of the late Mark Rich, the infamous billionaire commodities trader and former fugitive from justice.[3] At some point, Mr. Schachter started collecting and dealing in very expensive cars, including the fake R7, which we will refer to as the "Schachter Car." Mr. Schachter is now a serious collector and dealer, and lists nearly twenty valuable vintage Porsches that he owned at one point on his website, www.rovecars.com, including a fully restored 1973 Porsche RSR road car that was recently sold by Sotheby's for over $1 million. Mr. Schachter is rumored to have paid several million dollars for his fake R7.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 7, except admits that he is married to Ilona Rich, is an art dealer in New York, and passed the bar. Defendant denies the allegations in second sentence of paragraph

[3] Mark Rich died in 2013, leaving a fortune estimated at $2.5 billion, and was survived by Ilona Rich, her younger sister, and his second wife.

7, except admits that he is a collector of rare, vintage vehicles. Defendant denies the allegations in the third sentence of paragraph 7, except admits that he owns the domain for the website www.rovecars.com, which features numerous rare, vintage vehicles, and refers to that website for its contents. Defendant denies knowledge of rumors, and otherwise denies the allegations in the fourth sentence of paragraph 7. As to footnote 3, Defendant admits the allegations therein, except lacks knowledge or information sufficient to form a belief as to Mr. Rich's finances at the time of his death.

8. Mr. Schachter is now using his financial resources, influence, and connections to promote the Schachter Car as the real R7 – even though he must know his car is fake. Indeed, Plaintiff is informed and believes that Mr. Roddaro told Mr. Schachter about Plaintiff's car, but Mr. Schachter inexplicably proceeded with the purchase. Mr. Schachter's own experts have concluded that the entire rear end is neither original nor correct, but Mr. Schachter persists in claiming his car is R7 based upon a chassis stamp, which is something that is easily faked with a replacement body panel and new stamping. In 2015 Mr. Schachter implicitly acknowledged that his car was fake by advising in an email that he was returning it to the seller, but this never happened, and since then, Mr. Schachter has been doing everything he can to pass off his fake car as the real R7. Aware that the purported history and provenance of his car as represented by Mr. Baliva (the purported owner for 35 years) cannot be correct, Mr. Schachter has tried to change the backstory for his car when talking to the press. Similarly, when obvious

differences between the Schachter car and the real R7 are pointed out, Mr. Schachter simply alters his car to look more like the real R7.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 8. Defendant denies the second sentence of paragraph 8, except to admit that Mr. Roddaro informed him that Mr. Shalit owns a replica of R7. Defendant denies the allegations in the third sentence of paragraph 8. Defendant denies the allegations in the fourth sentence of paragraph 8 except to admit that he discussed returning R7 after purchasing it. Defendant denies the allegations in the fifth and sixth sentences of paragraph 8.

9. Even though he must know his car is fake, Mr. Schachter will not stop trying to pass off his fake car as the real R7. In July 2018, Mr. Schachter wrote an article for artnet news, a New York based magazine where he works as a columnist, in which he included two photographs of his replica car and presented it as the real R7. See https://news.artnet.com/opinion/kenny-schachter-summer-car-column-1320194. In May 2019, Mr. Schachter was profiled in Robb Report, a luxury-lifestyle magazine, and was pictured with his fake car, and in response to an interview question represents it as the real R7. See https://robbreport.com/shelter/art-collectibles/art-world-provocateur-kenny-schachter-2850583/. Both artnet news and the Robb Report are distributed in interstate commerce. At this point, a Google search for the chassis number of the real R7, "9113600686," produces search results with pictures of Mr. Schachter's fake R7. Further, Mr. Schachter has campaigned his fake car at vintage races and car shows, and

he is listed as the owner of R7 on the website www.911rsrownersclub.com. See https://911rsrownersclub.com/28rsrcarregistery/.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 9, except admits that he asserts that he is the owner of R7. Defendant denies the allegations in the second sentence of paragraph 9, except admits that he authored the referenced article which was published on *artnet news's* website; the article speaks for itself. Defendant denies the allegations in the third sentence of paragraph 9, except admits that the referenced article was published in *Robb Report*; the article speaks for itself. Defendant admits the allegations in the fourth sentence of paragraph 9. Defendant denies the allegations in the fifth sentence of paragraph 9, except admits that a Google search of "911 360 0686" reveals numerous pictures of R7. Defendant denies the allegations in the sixth sentence of paragraph 9, except admits that he is listed as the owner of R7 on the referenced website and that he has appeared with R7 at vintage races and car shows.

10. Mr. Schachter is promoting his car as the real R7 for his own financial gain, and is certainly well aware of the financial harm he is causing Plaintiff to suffer. Mr. Schachter is a dealer in art and collector cars, and he hopes to "save face" and also avoid a loss on his purchase of the fake car by trying to pass it off as the real car. The real R7 is likely worth millions of dollars, while a very good replica might be worth only a few hundred thousand dollars. Mr. Schachter has recently been trying to sell his fake R7 and tried to consign it for sale as the real R7.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 10, except admits that he asserts that he is the owner of R7. Defendant denies the allegations in the second sentence of paragraph 10, except admits that he is a dealer in art and rare and vintage vehicles. Defendant admits that R7 is valuable and asserts that he lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the third sentence of paragraph 10. Defendant denies the allegations in the fourth sentence of paragraph 10, except admits that he has recently attempted to sell R7.

11. Plaintiff would like to sell his real R7, but Mr. Schachter's conduct is making such a sale impossible. Who would want to buy Plaintiff's car, even at a fraction of its real value, only to then have to contend with a fake car being promoted by a well-connected collector with unlimited financial resources?

**Answer:** Defendant denies the allegations in paragraph 11.

12. This action is brought to hold Mr. Schachter accountable for his conduct and obtain redress for the financial harm Plaintiff has suffered.

**Answer:** Paragraph 12 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 12.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§1331, 1332, and Federal Rule of Civil Procedure 4(k)(2).

**Answer:** Paragraph 13 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies that this Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

14. Plaintiff is a resident of California. Defendant is U.S. citizen, he resides London and possibly New York City, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**Answer:** Paragraph 14 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant admits, on information and belief, the allegations in the first sentence of paragraph 14. Defendant denies the remainder of the allegations in paragraph 14, except admits that he is a citizen of the United States, a resident of New York City, and that the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Venue is proper in this District under 28 U.S.C. §1391(a)(1) and (2) and Federal Rule of Civil Procedure 4(k)(2).

**Answer:** Paragraph 15 consists of legal conclusions to which no response is required.

16. Defendant is employed in this District as a columnist for artnet news magazine, which is headquartered in this District, and Defendant sought to promote and pass off his replica car as R7 in the column he wrote for artnet news magazine in July 2018, which contains two pictures of Defendant posing with the fake car. In 2018, artnet news had an online circulation/page views of 2,486,651 from persons located in the state of New York. In May 2019, Defendant was interviewed by Robb Report magazine,

which has an office in New York City where its CEO is based, and is distributed at newsstands nationwide, including in this District. In the Robb Report magazine article, Defendant was pictured with his fake car, and in response to an interview question represents it to be the real R7. Also, on June 20, 2017, Defendant wrote an article for CNN's website, which exhibited a picture of the fake R7. See https://www.cnn.com/style/article/kenny-schachter-collision-of-art-design-and-cars/index.html. CNN is a U.S based news organization that distributes it content throughout the United States, including in this District.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 16, except admits that he has written columns as a freelance writer for *artnet news* and refers to the identified July 2018 column for its contents. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 16. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 16, except admits that he was interviewed by *Robb Report* magazine in May 2019. Defendant denies the allegations in the fourth sentence of paragraph 16, except admits that he was pictured with R7 in a *Robb Report* magazine article; the article speaks for itself. Defendant denies the allegations in the fifth sentence of paragraph 16, except admits that he wrote an article for CNN; the article speaks for itself. Defendant admits the allegations in the sixth sentence of paragraph 16.

17. To promote his cars and efforts to deal in cars, Defendant also maintains and operates the website www.rovecars.com, which until quite recently had a page devoted to R7 that pictured the fake R7. The website also features on one of its pages a 2016 article from Octane magazine in which Mr. Schachter passes of his car as R7. The website www.rovecars.com is readily accessible to anyone in the United States, the domain name was registered through a company based in Bellevue, Washington, while the website appears to be hosted by a company based in the U.S., with a legal department in Tempe, Arizona to handle copyright infringement complaints.

**Answer:** Defendant denies the allegations in the first two sentences of paragraph 17, except admits that he owns the domain for the website www.rovecars.com, which features numerous rare, vintage vehicles, and refers to that website for its full contents. Defendant lacks knowledge or information to form a belief as to the truth of the third sentence of paragraph 17.

18. The domain for the website www.911rsrownersclub.com in which owners of 1973 Porsche RSR cars can register their cars, and which currently lists Kenny Schachter as the owner of R7, was registered by a company located in Beaverton, Oregon, while the company hosting the website is headquartered in San Francisco, California.

**Answer:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18, except admits that the referenced website lists Defendant as R7's owner.

19. In addition to artnet news and the Robb Report, Defendant has also tried to pass off his car as the real R7 in an article that appeared in the online magazine Classic Driver on December 15, 2017, which featured several photographs of the fake R7, presents the Schachter Car as the real R7, and falsely portrays Plaintiff's car as not being authentic. Classic Driver has 5.5 million readers of its news items each month, and 1.43 million of those readers are based in the U.S. Defendant also passed off his car as the real R7 in an article in Octane magazine, which has a printed circulation of approximately 60,000 copies per month, and is the top ranked international car magazine by copies sold at Barnes & Noble stores in the United States.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 19, except admits that R7 appeared in an article in Classic Driver on December 15, 2017; the article speaks for itself. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 19. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 19, except admits that R7 was featured in an article in Octane magazine.

20. Defendant was born and raised in Long Island, is an attorney, and was admitted to practice in New York in 1988, but has been suspended from practice since November 2013. Defendant is a U.S. citizen by birth, and we are informed and believe

that Defendant remains a U.S. citizen.[4] Defendant has held shows of his art in New York and elsewhere in the United States, and offered for sale in the U.S. tee shirts he designed as well as his artwork, and artwork by members of his immediate family.

**Answer:** Defendant admits the allegations in paragraph 20, except to deny that he has ever been suspended from the practice of law.

## PARTIES

21. Plaintiff Jacob Shalit is a citizen and resident of the State of California, and resides in Los Angeles.

**Answer:** Defendant admits, on information and belief, the allegations in paragraph 21.

22. Defendant Kenny Schachter is a U.S. citizen, but appears to currently reside in London and possibly New York City, where he is employed by the online magazine artnet news as a columnist.

**Answer:** Defendant denies the allegations in paragraph 22, except admits that he is a U.S. Citizen, currently residing in New York City, and is a freelance writer for *artnet news*.

---

[4] A search of the Federal Register appears to show that some of Mr. Schachter's children may have renounced their citizenship, but does not show an entry indicating that Mr. Schachter has done so.

## GENERAL ALLEGATIONS

### I. The History of the Real R7.

23. In 1973 various racing rules and regulations had changed, which prevented the legendary Porsche 917, a purpose built race car, from participating in certain races. To comply with these new rules and regulations, Porsche needed to create a race car that was based on a road car, and sell at least 500 road legal versions of this car to the public. Porsche proceeded to create a race car based upon its iconic Porsche 911 road car, and this new race car was called a 911 Carrera RS or RSR, depending upon the options fitted to the car. Demand was so strong for this road legal race car that Porsche actually produced and sold 1525 of these cars in addition to thousands of standard 911 models. In 1973 Porsche also built 55 RSR race cars for privateer racing teams that were not street legal. Most importantly, for its factory racing team in 1973 Porsche built eight "prototype" 911 RSR race cars. These eight prototype cars are commonly referred to as R1 through R8, and the surviving examples are among the most valuable Porsche race cars. The car at issue here is known as R7.

**Answer:** Defendant admits the allegations in paragraph 23, except to deny the second sentence in paragraph 23, except to admit that Porsche initially chose to sell at least 500 road legal versions of this car to qualify the race car as a version of a publicly available road car.

24. R7 had a storied racing career. R7's most famous race was for the Porsche factory team at the 1973 24 Hours of Le Mans where it finished in fourth place. At that race it appeared in Martini Livery (silver paint with light blue, dark blue, and red

stripes) with a rear end featuring a turned up wrap around spoiler nicknamed the "Mary Stuart" tail as it resembled the high collars that appear in portraits of Mary Queen of Scots. Pictures of R7 at the 1973 Le Mans race are set forth in Exhibit A, p. 2.

**Answer:** Defendant admits the allegations in paragraph 24.

25. After finishing 4th at Le Mans in 1973, and then competing in the Osterreichring 1000 in June 1973, Porsche removed the Mary Stuart tail, and replaced it with a longer rectangular tail called a "long tail" and exported R7 to the Brumos racing team, based out of the Brumos Porsche dealership in Jacksonville, Florida, so it could be raced at the Watkins Glen track in New York. R7 was repainted in Brumos livery (white paintwork with wide blue and red stripes on top) and was driven at Watkins Glen by the legendary race car drivers Hurley Heywood and Peter Gregg.[5] Pictures of R7 in long tail form in Brumos team livery are set forth in Exhibit A, p. 3.

**Answer:** Defendant admits the allegations in paragraph 25 and footnote 5.

26. After the Watkins Glen race, R7 was sold to Hector Rebaque and exported to Mexico to be raced by the Mexico City based Rebaque Rojas team, where it was driven by the legendary race car drivers Memo Rojas and Hector Rebaque. From 1973 through 1974, R7 was raced in long tail form by the Rebaque Rojas team and was painted in Viceroy/Café Mexico livery, as shown in Exhibit A, p. 4.

[5] The Brumos team was a famous privateer racing team, operated by Peter Gregg, the owner of Brumos Porsche in Jacksonville, Florida.

**Answer:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26, except admits that R7 was sold to Hector Rebaque, was exported to Mexico, and was raced there by Mr. Rebaque.

27. Due to rule changes in 1975, the "long tail" on R7 was removed and replaced with a 1975 style tail and a full roll cage was fitted. The car was also repainted in Café Mexico livery and Viceroy livery. Also, due to damage, the rear wheels had to be replaced, and R7 was fitted with BBS brand rear wheels. Some pictures of R7 from 1975 showing these modifications are attached as Exhibit A, pp. 5-6.

**Answer:** Defendant denies the allegations in paragraph 27.

28. In 1975, R7 was in an accident while on route to a race in Mexico at the recently completed Monterrey Autodromo. This accident damaged the unibody chassis beyond the point where it could be economically repaired, but did not significantly damage the far more valuable mechanical parts (e.g., the engine, transmission, suspension, braking system, wheels, etc.), which were salvaged from the damaged body shell.

**Answer:** Defendant denies the allegations in paragraph 28.

29. Eventually, title to R7 along with the original chassis plate and the mechanical parts that were salvaged from damaged body shell were sold by Hector Rebaque to Diego Febles, who was a legendary privateer racer based in San Juan, Puerto Rico.

**Answer:** Defendant denies the allegations in paragraph 29.

30. By the early aughts, it was known among some Porsche cognoscenti that Diego Febles had the title to R7 as well as the original chassis plate and the salvaged mechanical parts that were sufficient to restore R7. In 2007 title to R7 as well as the original chassis plate and the salvaged mechanical parts, were sold and transferred to Toluca Lake Historics, a car restorer, that specialized in restoring vintage race cars for competitive racing.

**Answer:** Defendant denies the allegations in paragraph 30.

31. The parts purchased from Diego Febles are certainly authentic and from R7. The chassis plate with the chassis number for R7 is undoubtedly real, the transmission is correct for a 1973 RSR and even bears a scrutineering stamp from the 1974 Le Mans race that R7 participated in, and the serial number of the engine is one number above the serial number of the engine the Rebaque Rojas team was given to use at Le Mans in 1974, and which was replaced after the race. The brakes, front struts, front control arms, pedal box, oil cooler, and front and rear cross members are all correct for a 1973 RSR, but not necessarily for a later RSR or a road car. Some of the parts even came in a crate with the markings of the Rebaque Rojas team.

**Answer:** Defendant denies the allegations in paragraph 31, except to assert that he lacks knowledge or information sufficient to form a belief as to the truth of: (1) the allegations in the last sentence, and (2) the allegations in the second sentence regarding a scrutineering stamp on the transmission and (3) the allegation in the second sentence that the serial number of the engine is close to but different from one the Rebaque Rojas team was given to use in a race.

32. Plaintiff purchased the title to R7 as well as the original chassis plate and the salvaged mechanical parts, and commissioned Toluca Lake Historics to restore R7 in "long tail" form in Viceroy racing livery using a donor body shell. The restoration was completed in 2009, and a picture of the car competing in the Monterey Historics vintage race is attached as Exhibit A, p. 7.

**Answer:** Defendant denies the allegations in paragraph 32, except admits that Plaintiff's car does not feature R7's chassis or body.

33. Plaintiff's car, the real R7, is the only 1973 RSR prototype that exists in long tail form, as R6 has been restored in Martini Livery with a Mary Stuart tail. Plaintiff's car is also likely the only 1973 RSR prototype with its original mechanical parts, as opposed to "period" parts or reproduction parts. Plaintiff holds a California title to R7, a Certificate of Authenticity from Porsche, and FIA papers that permit Plaintiff to race his car as R7 at vintage car races throughout the world.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 33. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of paragraph 33, except denies that Mr. Shalit or anyone else possesses a "Certificate of Authenticity" issued by Porsche to the effect that his car is R7.

## II. The purported provenance and history of the Schachter Car confirms that it cannot be R7.

34. As a threshold issue, the purported provenance and history of the Schachter precludes the possibility that it is R7. The claims by Massimo Baliva that the

Schachter Car was in original condition in Martini livery as it appeared at Le Mans in 1973 confirms that it cannot be R7, as the race history shows that the rear end was replaced twice, the car was repainted at least three times, there were numerous modifications made to the car since it raced at Le Mans in 1973, and, of course, it was damaged in an accident in Mexico in 1975.

**Answer:** Defendant denies the allegations in paragraph 34.

35. Defendant has implicitly conceded that the purported provenance and history of his car, as attested to by Massimo Baliva (its purported owner for 35 years) could not possibly be correct. In a 2016 article in Octane magazine, Defendant changed the backstory for his car, and now claims that, far from being in original condition as claimed by Massimo Baliva, the Schachter car was actually converted back to a Mary Stuart tail and repainted in Martini livery by Massimo Baliva.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 35. Defendant denies the remainder of the allegations in paragraph 35, except admits that in November 2016, an article in *Octane* magazine discussed the R7; the article speaks for itself.

36. Of course, there is no documentation concerning this newly revised history of the Schachter Car that now, according to Defendant, was restored by Massimo Baliva – the same person who claimed the car was in unrestored original condition. Indeed, there is not a single known photograph of the Schachter Car during the thirty-five years it was purportedly owned by Mr. Baliva, before it suddenly appeared out of nowhere in 2012 in Martini livery with an incorrect and non-original Mary Stuart tail.

**Answer:** Defendant denies the allegation in paragraph 36, except to assert that he lacks knowledge or information sufficient to form a belief as to the allegations in the last sentence pertaining to the existence of photographs.

37. Further, one of the key documents supporting the purported provenance of the Schachter Car is fake. The Schachter Car is supported by a February 14, 1974 invoice on Brumos letterhead and signed by Peter Gregg purporting to show that the car was sold on that date to Hector Rebaque for $30,000. This invoice cannot be real. Documents from Brumos and Peter Gregg's files concerning R7 reveal that the car was actually sold much earlier, and the terms of the transaction were completely different, as the price was different and included some spare parts. Indeed, Brumos has no record of any sale of R7 to Hector Rebaque in 1974. The bogus invoice is also not on the correct Brumos letterhead for the time period, the signature of Peter Gregg bears no resemblance to other exemplars of his signature, and the formatting and wording of the invoice is entirely different from known period exemplars of Brumos invoices signed by Peter Gregg for retired race cars.

**Answer:** Defendant denies the allegations in paragraph 37, except to assert that he lacks knowledge or information sufficient to form a belief as to the allegations in the third sentence that Mr. Rebaque received the car prior to 1974.

38. The Schachter Car is not just a car that suddenly appeared out of nowhere without any provenance – it is a car with a fake provenance that lacks even the credibility of consistency. Defendant, however, rather than acknowledging his car is fake, continues to pass off his car as the real R7.

**Answer:** Defendant denies the allegations in paragraph 38.

**III. Countless features of the Schachter Car confirm that it cannot possibly be R7.**

39. Numerous features of the Schachter Car also confirm that it cannot be R7, whether in original condition as it was raced at Le Mans in 1973, or whether restored by Massimo Baliva, as Defendant now claims.

**Answer:** Defendant denies the allegations in paragraph 39.

40. The engine in the Schachter Car was not the engine installed in R7 when it was raced by the Rebaque Rojas team.

**Answer:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40.

41. The engine in the Schachter Car was actually installed in chassis no. 9113601113, which for a time was in the Blackhawk Museum in California, before it was sold. Plaintiff has no idea how that engine wound up in the Schachter Car, but the history of RSR no. 91113601113 indicates that it did pass through Claudio Roddaro's hands (the person who sold the Schachter Car to Defendant) shortly before the Schachter Car first appeared.

**Answer:** Defendant denies on information and belief the allegations in paragraph 41.

42. The real R7 was also fitted with a long-distance fuel tank for the 1973 Le Mans race, which had filling tubes aligned at an angle with the filling holes on the hood similarly aligned. See Exhibit A, p. 2 (Photos of R7 at Le Mans in 1973). The Schachter car features a smaller capacity and differently shaped plastic tank and is fitted with a

spare wheel that was never present on R7. The filling tubes on the Schachter car are not aligned on an angle, but are aligned side by side, and the filling holes in the hood are similarly aligned. See Exhibit A, p. 9 (photos of the Schachter Car in 2013 and 2018). There would be no reason to remove the long-distance fuel tank fitted to the real R7 and replace it with a modified road car tank and a new hood to fit the position of the filling tubes on the new tank. This obvious discrepancy indicates that the Schachter Car cannot be R7.

**Answer:** Defendant admits the allegations in the first three sentences of paragraph 42. Defendant denies the allegations of the last two sentences of paragraph 42.

43. The area of the Schachter car where the chassis stamp is located appears to have been artificially aged, indicating that all or part of the front end was replaced with blank chassis panels that could be stamped with the serial number for R7 and then painted over, making it appear as if the Schachter car has a correct and unaltered chassis stamp. The area under the hood on the Schachter car, especially near the chassis stamping, appears to have been made to look old with some crudely applied black paint to make the interior paint appear old and unrestored. However, this aging effect does not appear underneath the front of the car or in the engine compartment, which actually shows little sign of aging and appears to feature fresh welds and paint. The fact that the Schachter Car seems to be artificially aged, and aged in an inconsistent manner, is another indication that it could not possibly be R7.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 43, except admits that the serial number for R7 is stamped into the chassis. Defendant denies the remainder of the allegations in paragraph 43.

44. The chassis plate on the Schachter Car features no evidence of aging, the chassis number is in the wrong font, and the stamping appears to have been applied with inconsistent pressure. Further, the rivets used to affix it to the Schachter car are new and show no signs of aging that one would expect if the chassis plate were real and affixed to an original front end more than forty years ago.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 44, except admits that the chassis plate was not on R7 more than 40 years ago.

45. Numerous interior features of the Schachter Car indicate that it was originally a road car, and could not possibly be R7. The dashboard instrumentation on the Schachter Car is from a 1974 car and is stamped as such. This is not a part that is normally changed, and the fact that the instruments are not from 1973 indicates that the Schachter Car cannot be R7.

**Answer:** Defendant denies the allegations in paragraph 45, except asserts that he lacks knowledge or information sufficient to form a belief as to the stamping on the dashboard instrumentation on his car, and admits on information and belief that one or more dashboard instruments may have been changed.

46. The high mileage on the odometer for the Schachter Car listed at either 21,000 km or 37500 km in various documents and online postings indicates that it was

likely a road car, as the real R7 only participated in sixteen races over two and half years, and was never street legal.

**Answer:** Defendant denies the allegations in paragraph 46, except to assert that Defendant lacks knowledge or information sufficient to form a belief as to the odometer reading in various unreferenced documents and postings.

47. The heater duct under the dashboard for the Schachter Car is also not a feature of a 1973 RSR prototype.

**Answer:** Defendant denies the allegations in paragraph 47.

48. The interior of the real R7 was initially painted black and covered with black felt (see Exhibit A, p. 2 (the view into the car from the rear window shows a black interior)), while the interior of the Schachter car is white without any trace of black paint, yet was represented by Mr. Baliva (it's purported owner for thirty-five years) to feature original interior paint, which could not possibly be the case.

**Answer:** Defendant denies the allegations in paragraph 48, except denies information or belief as to what oral statements Mr. Baliva may have made and refers to the written statements of Mr. Baliva for their contents.

49. The seat rails and the fittings are also not correct for a 1973 prototype RSR, and because this is not a part that would wear out and need to be changed, it also indicates that the Schachter Car cannot be R7.

**Answer:** Defendant denies the allegations in paragraph 49, except to assert that he lacks sufficient knowledge or information to form a belief as to the allegations pertaining to the seat rails and fittings.

50. The Mary Stuart tail on the Schachter Car is neither original nor correct for a 1973 RSR. The shape of the tail is wrong, the vent panel on the engine cover is from a later car, the taillights feature white backup lights that are from a later car and were never on R7, and the paint is incorrect as there were never stripes under the Mary Stuart tail on the real R7. Also, the window stays on the front and rear windows of the Schachter Car were never present on R7 when it raced at Lemans in 1973. See Exhibit A, p. 8 (top photo of the Schachter Car in 2012).

**Answer:** Defendant denies the allegations in paragraph 50, except admits that the rear spoiler currently on R7 is not the original rear spoiler that was affixed to R7 during the 1973 24 Hours of Le Mans, and that the window stays were not used on R7 when it was raced at Le Mans in 1973.

51. In 1975, the real R7 had a full roll cage fitted, but the Schachter Car has no such roll cage, and there is no evidence (e.g., patched holes in the body) indicating that a full roll cage was ever fitted to the Schachter Car.

**Answer:** Defendant denies the allegations in paragraph 51.

52. The Schachter Car also features patched holes where release cables would be found for the trunk and engine cover on road cars. The 1973 RSR prototypes were never street legal and did not have holes for these release cables.

**Answer:** Defendant denies on information or belief the allegations in paragraph 52, except admits that the 1973 RSR prototypes were never street legal.

53. The real R7 had driving lights mounted at several points on the roof, an antenna mounted near the middle of the roof, and additional driving lights on the front

fenders, both doors, and the rear quarter panel. The Schachter Car when it first appeared in 2012 did not even have running lights mounted on the doors. See Exhibit A, p. 8 (top photo of the Schachter Car in 2012). Further, there is no evidence of any holes made to accommodate the various lights that were fitted to the real R7, let alone evidence of wiring and connections to power those lights. However, rather than acknowledge that his car is not R7, Mr. Schachter simply installed the missing lights on the doors to make it look more like R7, so he could pass his car off as the real R7. See Exhibit A, p. 8 (bottom photo of the Schachter Car in 2015).

**Answer:** Defendant denies the allegations in paragraph 53, except admits that R7 featured different lights at different times.

54. The Schachter Car also features brake calipers and rotors from a 1974 RSR as well as cooling hoses under the hood that were not present on the 1973 RSR prototypes. While the brake rotors on R7 could certainly have been changed from the slotted design used in 1973 to the drilled design used from 1974 onward, the brake calipers would likely not have worn out during R7's very brief racing career, and are not an item one would expect to have been changed in an unrestored car. One would also not expect to find cooling hoses as they do not appear in any historical photographs of R7 or other 1973 prototype RSRs. Given the claim by Mr. Baliva that the Schachter Car is in original unrestored condition, the presence of these features from later RSR models, indicates that the Schachter Car is not R7.

**Answer:** Defendant denies the allegations in paragraph 54, except admits that the brakes in R7 may be different from the ones initially used in R7 and to assert that

he lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations pertaining to the cooling hoses.

55. There are indications that the front end of the Schachter Car was replaced with blank chassis panels that were be stamped with the serial number for R7 and then painted over, making it appear as if the Schachter car has a correct and unaltered chassis stamp. Tacky welds and uneven sealant that are inconsistent with an untouched unibody are visible on the Schachter car. Also, the front bumper retaining lip has not been properly finished on the Schachter car.

**Answer:** Defendant denies the allegations in paragraph 55, except to assert that he lacks knowledge or information sufficient to form a belief as to the truth of the last sentence of paragraph 55.

56. The chassis stamp on the Schachter Car, when compared side by side with the chassis stamps on other RSR cars, including R6, looks unusually symmetrical and does not appear to be an authentic stamp applied at the factory in 1973.

**Answer:** Defendant denies the allegations in paragraph 56.

57. The Schachter car has a metal paint code tag on the driver's door jamb, but photographs of R7 from 1974 show that there was no such tag fitted to the car at that time. Obviously, the presence of this paint code tag on the Schachter Car indicates that it cannot be R7.

**Answer:** Defendant denies the allegations in paragraph 57, except to assert that he lacks sufficient knowledge or information to form a belief as to the allegations in the first sentence of paragraph 57.

58. There is also evidence of considerable undercoating in a wheel well on the Schachter Car, which would not be present on the real R7. The chassis of the 1973 prototype RSRs were made as light as possible and were never street legal. They were briefly raced by the factory team and then typically sold to privateer racers after less than a year. Long term durability and corrosion resistance was not a priority, so significant undercoating that would add weight was not applied.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 58, except admits that R7 did not originally contain considerable undercoating in the wheel wells. Defendant admits the allegations in second, third, and fourth sentences of paragraph 58.

**IV. Rather than publicly concede that his car cannot be R7, Defendant has altered the car, changed its backstory, and even hired experts to conduct a limited "examination" that his fake car was certain to pass, all so he can continue to pass off his car as the real R7.**

59. Defendant knows his car is not R7. We are informed and believe that Claudio Roddaro who sold the car to Defendant even told Defendant about Plaintiff's car. Defendant's own experts have concluded the entire rear end on the Schachter Car is neither original nor correct. In 2015 Mr. Schachter implicitly acknowledged that his car was fake by advising in an email that he was returning it.

**Answer:** Defendant denies the allegations as to the first sentence in paragraph 59. As to the second sentence in paragraph 59, Defendant denies the allegations,

except admits that Mr. Roddaro informed him that Plaintiff owned a replica of R7. Defendant denies the allegations in the third sentence of paragraph.

60. However, rather than acknowledge that he did not do adequate research and due diligence and bought a fake car, Defendant, in an effort to "save face" and avoid a financial loss, has been doing everything possible to pass off this fake car as R7.

**Answer:** Defendant denies the allegations in paragraph 60.

61. When confronted with evidence that the purported history and provenance of his car, as conveyed by Massimo Baliva (the owner of the Schachter Car for 35 years) cannot be correct, Defendant simply concocted a new history and backstory, and now claims that his car was actually restored back to a "Mary Stuart" tail by Massimo Baliva – who purportedly owned the Schachter Car for 35 years and claimed it was in original unrestored condition. Of course, Defendant has no details or photos of this restoration (e.g., who did it, when it was done, and what was done), or even a single photograph of his car from 1977 to 2012. Nor does Defendant explain why his car has an aged patina if it was a restored car that was stored in a secret private collection for 35 years, and apparently never driven.

**Answer:** Defendant denies the allegations in paragraph 61, except denies knowledge or information sufficient to form a belief about oral statements attributed to Mr. Baliva and refers to the written statements of Mr. Baliva for their contents.

62. When Defendant realized that the real R7 had running lights on the doors when it raced at Le Mans, and his car did not have those lights, Defendant simply

installed those lights in order to make his car look more like the real R7, so he could more easily pass it off as R7.

**Answer:** Defendant denies the allegations in paragraph 62, except admits that R7 was modified by restoring lights that it had contained when raced at Le Mans.

63. Defendant, in an effort to continue to pass off his car as the real R7, even conducted testing that he knew would show that the chassis stamp on his car had not been altered. The chassis stamp on a good fake, like the Schachter car, would not be altered as that would be easily detected. Instead, an entirely new front end would be fitted with a blank panel that can be freshly stamped and then painted, which would pass the test Defendant subjected his car to with flying colors. Defendant essentially conducted a test he knew the car would pass, while ignoring all of the other evidence that his car is fake. No experienced collector, nor even a reasonable person, would claim the Schachter Car is R7 based on such a test, when everything else about that car indicates that it is a fake.

**Answer:** Defendant denies the allegations in paragraph 63, except admits that tests have shown that the chassis stamp on his car has not been altered.

64. Defendant's motive in trying to pass his car off as R7 is to sell that car for the highest price possible. Defendant collects and deals in classic cars, and within the last two months has tried to consign his car for sale as R7 to a dealer that would undoubtedly have marketed the car to persons and dealers in the United States.

**Answer:** Defendant denies the allegations in the first sentence of paragraph 64. Defendant denies the allegations in the second sentence, except admits that he collects and deals in classic cars and recently attempted to sell R7.

65. Having a second, albeit fake R7, being actively promoted by Defendant as the real R7 has made it impossible for Plaintiff to promote and sell his car, and as a result Plaintiff has suffered damages. Anyone who buys Plaintiff's car, which is the real R7, would then have to contend with a fake car being promoted by a well-connected collector with unlimited financial resources, who simply will not concede that his car is fake.

**Answer:** Defendant denies the allegations in paragraph 65.

66. Defendant has persisted with his claim to own the real R7, knowing full well that Plaintiff would suffer damages, and that any benefit that Defendant might obtain from selling his car as R7 would be at Plaintiff's expense.

**Answer:** Defendant denies the allegations in paragraph 66.

**FIRST CAUSE OF ACTION**
**(Unfair Competition)**

67. Each of the above allegations set forth in paragraphs 1 through 66 is incorporated herein as though recited verbatim and at length.

**Answer:** Defendant repeats and realleges his responses to paragraphs 1 through 66 of the Complaint.

68. Defendant's efforts to promote his car as the real R7 misrepresents the true characteristics, origin, and nature of that car, as it is undoubtedly not the real R7. Indeed, Defendant's car is undoubtedly a much less valuable car that was modified with various period parts and painted to look like the real R7.

**Answer:** Paragraph 68 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 68.

69. Also, given that there can only be one real R7, Defendant's efforts to promote his car as the real R7 necessarily disparages Plaintiff's car, which is the real R7. Essentially, Defendant's promotion of his car as R7 necessarily brands Plaintiff's car as a fake, even though it is the real R7.

**Answer:** Paragraph 69 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 69.

70. Defendant has actively promoted his fake car in interstate commerce, including in nationally distributed magazines, and various U.S. based websites.

**Answer:** Paragraph 70 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 70.

71. Defendant is a collector and dealer in exotic cars, including vintage Porsches, maintains a website for commercial purposes, and regularly appears in magazine features and articles to promote his activities dealing in exotic cars. Defendant has undertaken the foregoing conduct for the commercial purpose of selling his fake R7 as the real R7, which would produce substantial profits for him, and promote his business as a collector and dealer in exotic cars.

**Answer:** Paragraph 71 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 71, except admits that he has purchased and sold rare and vintage cars.

72. Defendant's conduct is likely to cause mistake and deceive as to which car is the real R7. Indeed, a Google search for the R7 chassis number results in countless pictures of Defendant's fake car.

**Answer:** Paragraph 72 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 72.

73. The foregoing conduct by Defendant constitutes unfair competition under the Lanham Act.

**Answer:** Paragraph 73 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 73.

74. Plaintiff has suffered and will continue to suffer damages on account of Defendant's conduct. Plaintiff's car is worth less, and is for all intents and purposes is unsaleable as R7, given that Defendant persists in promoting his car as the real R7.

**Answer:** Paragraph 74 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 74.

**SECOND CAUSE OF ACTION**
**(Common Law Unfair Competition)**

75. Each of the above allegations set forth in paragraphs 1 through 74 is incorporated herein as though recited verbatim and at length.

**Answer:** Defendant repeats and realleges his responses to paragraphs 1 through 74 of the Complaint as if fully set forth herein.

76. The foregoing conduct by Defendant also constitutes unfair competition under the common law of New York.

**Answer:** Paragraph 76 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 76.

77. Plaintiff has suffered and will continue to suffer damages on account of Defendant's conduct.

**Answer:** Paragraph 77 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 77.

**THIRD CAUSE OF ACTION**
**(Fraud)**

78. Each of the above allegations set forth in paragraphs 1 through 77 is incorporated herein as though recited verbatim and at length.

**Answer:** Defendant repeats and realleges its responses to paragraphs 1 through 74 of the Complaint as if fully set forth herein.

79. Defendant has actual or constructive knowledge that his car is not the real R7, but continues to promote that car as the real R7.

**Answer:** Paragraph 79 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 79.

80. Defendant has actual or constructive knowledge that continuing to promote his car as the real R7 will cause Plaintiff to suffer damages, as Defendant's conduct brands Plaintiff's real R7 as a fake car.

**Answer:** Paragraph 80 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 80.

81. Defendant's intention in representing his car as the real R7 is for the media, collectors, and prospective purchasers to rely upon that representation, accept Defendant's car as the real R7, and simultaneously brand Plaintiff's car as a fake. Defendant's goal is to sell his fake car as the real R7, enriching himself at the expense of Plaintiff who owns the real R7.

**Answer:** Paragraph 81 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 81, except admits that he has represented to others that R7 is the only authentic R7.

82. Defendant's misrepresentations have largely succeeded, as a Google search for the R7 chassis number results in countless pictures of Defendant's fake car,

which has necessarily cast Plaintiff's car as a fake car, diminishing the value of Plaintiff's car, which is the real R7.

**Answer:** Paragraph 82 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 82, except admits that a Google search of "911 360 0686" reveals images of R7.

83. Plaintiff has suffered and will continue to suffer damages on account of Defendant's conduct.

**Answer:** Paragraph 83 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 83.

## FOURTH CAUSE OF ACTION
## (Intentional Interference with Prospective Economic Advantage)

84. Each of the above allegations set forth in paragraphs 1 through 83 is incorporated herein as though recited verbatim and at length.

**Answer:** Defendant repeats and realleges his responses to paragraphs 1 through 83 of the Complaint as if fully set forth herein.

85. Plaintiff is interested in promoting his car as R7 with an eye towards eventually selling it, and to that end has promoted the car by participating in vintage car racing events.

**Answer:** Defendant denies the allegations in paragraph 85, except admits on information and belief that Plaintiff has participated in vintage car racing events with the car he claims is R7.

86. Defendant at all relevant times was aware of Plaintiff's car and that Plaintiff wished to promote that car as R7 to other collectors and prospective purchasers for the purpose of eventually selling it.

**Answer:** Defendant denies the allegations in paragraph 86, except admits that he is aware of Plaintiff's representations that his car is the authentic R7.

87. Defendant engaged in the foregoing conduct to disrupt Plaintiff's efforts to promote Plaintiff's car as R7 to other collectors and prospective purchasers.

**Answer:** Paragraph 87 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 87.

88. Defendant's conduct was wrongful, because he hoped to promote his fake car as the real R7 and brand Plaintiff's real car as a fake, for the purpose of enriching himself at Plaintiff's expense.

**Answer:** Paragraph 88 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 88.

89. Defendant's efforts have succeeded, as a Google search for the R7 chassis number results in countless pictures of Defendant's fake car, which has necessarily cast

Plaintiff's car as a fake car, diminishing the value of Plaintiff's car, and rendering that car unsaleable as R7.

**Answer:** Defendant denies the allegations in paragraph 89, except admits that a Google search of "911 360 0686" reveals images of R7.

90. Plaintiff has suffered and will continue to suffer damages on account of Defendant's conduct to disrupt Plaintiff's efforts to promote his car as the real R7.

**Answer:** Paragraph 90 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 90.

**FIFTH CAUSE OF ACTION**
**(Negligent Interference with Prospective Economic Advantage)**

91. Each of the above allegations set forth in paragraphs 1 through 90 is incorporated herein as though recited verbatim and at length.

**Answer:** Defendant repeats and realleges his responses to paragraphs 1 through 91 of the Complaint as if fully set forth herein.

92. Plaintiff is interested in promoting his car as R7 with an eye towards eventually selling or trading it, and to that end has promoted the car by participating in vintage car racing events.

**Answer:** Defendant denies the allegations in paragraph 92, except admits on information and belief that Plaintiff has participated in vintage car racing events with the car he contends is R7.

93. Defendant at all relevant times should have been aware of Plaintiff's car and that Plaintiff wished to promote that car as R7 to other collectors and prospective purchasers for the purpose of eventually selling it.

**Answer:** Defendant denies the allegations in paragraph 93, except admits that he is aware of Plaintiff's representations that his car is the authentic R7.

94. Defendant should have known that his conduct would disrupt Plaintiff's efforts to promote Plaintiff's car as R7 to other collectors and prospective purchasers.

**Answer:** Paragraph 94 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 94.

95. Defendant conduct was wrongful, because he hoped to promote his fake car as the real R7 and brand Plaintiff's real car as a fake, for the purpose of enriching himself at Plaintiff's expense.

**Answer:** Paragraph 95 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 95.

96. Defendant's efforts have succeeded, as a Google search for the R7 chassis number results in countless pictures of Defendant's fake car, which has necessarily cast Plaintiff's car as a fake car, diminishing the value of Plaintiff's car, and rendering that car unsaleable as R7.

**Answer:** Defendant denies the allegations in paragraph 96, except admits that a Google search of "911 360 0686" reveals images of R7.

97. Plaintiff has suffered and will continue to suffer damages on account of Defendant's conduct.

**Answer:** Paragraph 97 consists of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 97.

**SIXTH CAUSE OF ACTION**
**(Unjust Enrichment)**

98. Each of the above allegations set forth in paragraphs 1 through 97 is incorporated herein as though recited verbatim and at length.

**Answer:** Defendant repeats and realleges his responses to paragraphs 1 through 98 of the Complaint as if fully set forth herein.

99. Defendant, by virtue of the foregoing conduct has enhanced the value of his fake car at the expense of Plaintiff by falsely branding Plaintiff's real car as a fake.

**Answer:** Paragraph 99 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 99.

100. It would be unjust to permit Defendant to profit from this misconduct undertaken at Plaintiff's expense.

**Answer:** Paragraph 100 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 100.

101. To the extent Defendant reaps any financial benefit on account of passing off his fake R7 as the real R7, such a benefit should be disgorged and paid to Plaintiff.

**Answer:** Paragraph 101 consist of legal conclusions to which no response is required. To the extent a response may be required, Defendant denies the allegations in paragraph 101.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

a. Awarding Plaintiff compensatory and equitable damages;

b. Awarding Plaintiff punitive damages;

c. Awarding injunctive relief;

d. Awarding Plaintiff reasonable attorneys' fees and costs; and

e. Awarding Plaintiff such other and further relief as the Court may deem just and proper.

**Answer:** Defendant denies that Plaintiff is entitled to the relief requested in this section, or to any relief.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative defenses:

### First Affirmative Defense

102. The Complaint fails to state a claim upon which relief can be granted.

## COUNTERCLAIMS

In support of Counterclaims against Plaintiff, Defendant/Counterclaim-Plaintiff Mr. Schachter alleges as follows:

1. This case concerns disputed ownership over a 1973 Porsche 911 RSR prototype race car with the chassis number 9113600686, commonly referred to as R7. R7 is unique and valuable.

2. In 1973, Porsche Racing sold R7 to Peter Gregg, owner of Brumos Racing.

3. Peter Gregg thereafter sold R7 to Hector Rebaque.

4. On April 14, 1977, Hector Rebaque sold R7 to Gonzalo Baca Spross.

5. On November 30, 1977, Gonzalo Baca Spross sold R7 to Massimo Baliva.

6. On October 29, 2011, Massimo Baliva sold R7 to Ronald Hughes.

7. In 2014, RS Trading acquired R7 (the "Mr. Schachter's Car") from Claudio Roddaro on behalf of Ronald Hughes and thereafter Mr. Schachter was responsible for managing the car.

8. Thereafter, in 2019, Mr. Schachter acquired the car from RS Trading.

9. During 2019, Mr. Schachter has had communications with potential buyers of Mr. Schachter's Car.

10. Mr. Shalit interfered with the success of those communications, informing potential buyers or causing his representative to inform potential buyers that he owns a car that he claims is R7 (the "Shalit Car").

11. As a result of that interference and Mr. Shalit's claim that he owns R7, Mr. Schachter has been unable to sell Mr. Schachter's Car at the price R7 would be able to command but for Mr. Shalit's claim that his car is R7.

12. According to Mr. Shalit, the Shalit Car was built using a donor chassis from a different 1973 Porsche 911.

13. Mr. Shalit claims to own parts salvaged from the alleged wreckage of R7 which he asserts destroyed its chassis.

14. R7 was not wrecked though, and the parts Mr. Shalit owns are therefore not from R7.

15. The parts Mr. Shalit claims belonged to R7 are not in the Shalit Car when it is raced.

16. Mr. Shalit knows that the Shalit Car is not R7 and that the Shalit Car has a chassis that never belonged to R7 and that when he races the Shalit Car it contains no parts, or nearly no parts, that belonged to R7. Mr. Shalit knows that his characterization of the Shalit Car as R7 is false. Even if he possesses some spare parts from R7, which he does not, those parts do not amount to R7 or turn his replica into R7.

17. Mr. Shalit is interested in promoting the Shalit Car as R7 with an eye toward eventually selling it, and to that end has promoted the car by participating in vintage racing events and publicly describing the car as R7.

**FIRST COUNTERCLAIM**

**(Slander of Title)**

18. Mr. Schachter repeats and realleges his allegations in paragraphs 1 through 17 of the Counterclaims as if fully set forth herein.

19. Mr. Schachter's Car is R7, and Mr. Schachter is the true owner of R7.

20. Mr. Shalit has falsely and improperly asserted ownership over R7, thereby calling into question the validity of Mr. Schachter's ownership of R7.

21. Mr. Shalit personally or through a representative has contacted potential buyers of Mr. Schachter's Car and asserted a false claim of ownership of R7 in an effort to prevent Mr. Schachter from accomplishing the sale of Mr. Schachter's Car.

22. Mr. Shalit's communications regarding his false claim of ownership have been reasonably calculated to cause harm to Mr. Schachter or have been made with reckless disregard of the truth.

23. But for Mr. Shalit's false claims of ownership, Mr. Schachter would have sold Mr. Schachter's Car for a price reflecting the full value of R7, a unique and valuable

vintage racing car. Mr. Shalit's actions have thus been a direct and proximate cause of the damages Mr. Schachter incurred.

24. As a result of the foregoing, Mr. Schachter has suffered and will continue to suffer damages.

**SECOND COUNTERCLAIM**

**(Unfair Competition: Section 43(a) of the Lanham Act, U.S.C. § 1125(a))**

25. Mr. Schachter repeats and realleges his allegations in paragraphs 1 through 17 of the Counterclaims as if fully set forth herein.

26. Mr. Shalit made false, misleading, and deceptive statements regarding Mr. Schachter's ownership of R7.

27. For example, Mr. Shalit actively and falsely promotes the Shalit Car in interstate commerce at various vintage car racing events.

28. At these vintage car racing events, Mr. Shalit falsely represented to various individuals that he owns the real R7 and that Mr. Schachter's Car is a fake.

29. Through these statements, Mr. Shalit deceived potential buyers in the United States.

30. As a result of the foregoing, Mr. Schachter has suffered and will continue to suffer damages.

**THIRD COUNTERCLAIM**

**(Intentional Interference with Prospective Economic Advantage)**

31. Mr. Schachter repeats and realleges paragraphs 1 through 17 of the Counterclaims as if fully set forth herein.

32. In 2019, Mr. Schachter engaged in communications with potential buyers about selling Mr. Schachter's Car to them.

33. Mr. Shalit has knowingly interfered with those potential sales by falsely and wrongfully asserting that he rather than Mr. Schachter owns R7, despite knowing that neither the few spare parts he possesses nor the purported replica of R7 built entirely or about entirely with parts from other cars constitute R7.

34. As a result of Mr. Shalit's wrongful conduct, buyers who otherwise would have purchased R7 have decided not to proceed with their purchase causing Mr. Schachter harm.

**FOURTH COUNTERCLAIM**

**(Declaratory Judgment)**

35. Mr. Schachter repeats and realleges paragraphs 1 through 17 of the Counterclaims as if fully set forth herein.

36. Mr. Schachter's request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202; Rule 57 of the Federal Rules of Civil Procedure; and the general legal and equitable powers of this Court.

37. Mr. Schachter seeks a declaration:

(i) Declaring that Defendant is the true owner of R7, and

(ii) Enjoining Plaintiff from falsely holding himself out as the true owner of R7.

**DEFENDANT/COUNTERCLAIM-PLAINTIFF'S PRAYER FOR RELIEF**

**WHEREFORE**, Defendant/Counterclaim-Plaintiff requests judgment dismissing the Complaint in its entirety with prejudice, and entering judgment in his favor on his counterclaim, and specifically that the Court enter an Order:

(i) Declaring that Defendant is the true owner of R7;

(ii) Enjoining Plaintiff from falsely holding himself out as the true owner of R7;

(iii) Awarding an amount of damages to be determined at trial;

(iv) Awarding Defendant the costs of this action, including attorney's fees; and

(v) Awarding all such further relief, in law or in equity, to which Defendant may be entitled.

Dated: New York, New York
September 24, 2019

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: __/s/ John S. Kiernan_______
John S. Kiernan
Zachary Saltzman
Joshua E. Roberts
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendant/Counterclaim-Plaintiff*